CITY OF KRUM, Texas, Appellant

v.

Taylor RICE, Appellee

NO. 02–15–00342–CV

Court of Appeals of Texas,
Fort Worth.

DELIVERED: December 15, 2016

Clark McCoy, Wolfe, Tidwell & Mccoy L.L.P., Frisco, TX, for Appellant.

Richard Gladden, Law Office of Richard Gladden, Denton, TX, for Appellee.

Scott Houston, General Counsel, Texas Municipal League, Austin, TX, for Amici Curiae.

PANEL: DAUPHINOT and GARDNER, JJ.; and KERRY FITZGERALD (Senior Justice, Retired, Sitting by Assignment).

## OPINION

LEE ANN DAUPHINOT, JUSTICE

In this interlocutory appeal, Appellant the City of Krum complains of the trial court's denial of its plea to the jurisdiction in the suit brought against it by Appellee Taylor Rice.[1] Rice brought this suit challenging Krum's sex offender residency restrictions ordinance (SORRO). In five issues, Krum argues that the trial court does not have jurisdiction over Rice's claims because the SORRO is a penal ordinance, that Rice has no standing to challenge the SORRO, that the trial court erred by allowing deemed admissions to be withdrawn, that the trial court erred by not dismissing Rice's claim for failure to provide pre-suit notice, and that it had the authority to enact the SORRO. Because we hold that the SORRO is a civil ordinance and that the trial court did not err by not dismissing Rice's claims, we affirm.

## Background

Krum enacted its SORRO in 2012.[2] The SORRO applies to any person who, because of a violation involving a person less

---

1. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(8) (West Supp. 2016).

2. Krum, Tex., Ordinance 2012–01–01 (Jan. 23, 2012) (amending chapter 8 of Krum's Code of Ordinances to add the SORRO, codified at Krum, Tex., Code of Ordinances ch. 8, art. 8.05 (2016)).

than sixteen years of age, is required to register on the Texas Department of Public Safety's sex offender database.[3] The SORRO prohibits such a person from establishing a residence in Krum that is within 2,000 feet of any place where children commonly gather.[4] A violation under the SORRO is a misdemeanor subject to a fine of up to $500.[5] Each day a person is in violation of the SORRO constitutes a separate offense.[6] The ordinance contains a severability clause.[7]

In 2014, Rice pled guilty under a plea agreement to sexual assault of a fourteen-year-old girl.[8] Under the terms of his deferred adjudication community supervision, Rice was required to comply with sex offender registration procedures and to not go in, on, or within 1,000 feet of "a premise where children commonly gather, including a . . . playground."

Rice was twenty-two at the time he filed this suit. Prior to his arrest, Rice had been living with his parents in Krum at a house that is directly adjacent to Krum Municipal Park. The distance between the park and the house is seventy-seven feet, and thus Rice is prohibited by the SORRO from living at the house and is prohibited by his probation terms from going to the house.

Rice sued Krum alleging that he had been ordered by two officers with the City of Krum Police Department to vacate his residence at his parents' house and that Krum police officers informed him that under Krum's SORRO, he would be sub-

ject to a $500 fine for each day that he continued to live at the house. Rice stated that it was his desire to return to live in Krum, with his parents or at another unspecified location.

Rice alleged that as a general law city, Krum did not have the authority to enact the SORRO. He sought a declaratory judgment that Krum's SORRO violated article XI, section 4 of the Texas Constitution[9] and was therefore void. He also sought temporary and permanent injunctions prohibiting Krum from enforcing its SORRO against him.

Prior to his filing suit, Rice's attorney sent a letter to Krum's attorney notifying him of Rice's intention to sue. The letter stated that it was "[p]ursuant to our telephone conversation late last month" and had been sent (1) to confirm that the attorney was acting as Krum's city attorney and (2) to provide the pre-suit notice required under section 101.101 of the civil practice and remedies code.[10] The letter informed Krum's attorney that Rice would be suing Krum unless it repealed its SORRO within thirty days.

In the letter, Rice's attorney stated that because of the SORRO, approximately two months prior to the date of the letter, Rice had been ordered to vacate his residence at his parents' house and had been told he would be subjected to a $500 fine for each day that he stayed at the residence. The letter notified Krum's attorney that the Texas Attorney General's office had issued

---

3. Krum, Tex., Code of Ordinances § 8.05.001 (defining "Sex offender").

4. *Id.* § 8.05.002(a).

5. *Id.* § 8.05.002(c).

6. Krum, Tex., Ordinance 2012–01–01, § 4.

7. *Id.* § 3.

8. *See* Tex. Penal Code Ann. § 22.011(a)(2), (c) (West 2011).

9. Tex. Const. art. XI, § 4 (setting out the authority for cities and towns with a population of 5,000).

10. Tex. Civ. Prac. & Rem. Code Ann. § 101.101 (West 2011).

an opinion concluding that general law cities such as Krum do not have the legal authority under article XI, section 4 of the Texas Constitution to enact SORROs, and that since the date of that Attorney General opinion, the Texas legislature had not enacted legislation to provide such authority to general law cities.

The letter further stated that because of Krum's SORRO, Rice, "under threat of prosecution under the void ordinance, has been forced to vacate his residence, and is unable to return and live in his residence without fear of such prosecution." Krum's attorney received the letter on January 28, 2015, and Rice filed suit nearly two months later.

In June 2015, Krum's attorney faxed written discovery requests to Rice's attorney, including a request for admissions. Rice did not timely respond, and thus the admissions were deemed admitted.[11] In August 2015, Krum filed a plea to the jurisdiction, based in part on the deemed admissions.

Rice's attorney then filed a motion to withdraw the deemed admissions against his client. He asserted that he had first discovered his failure to respond to the discovery requests when he reviewed Krum's plea to the jurisdiction. He stated that the failure to respond arose from his moving offices and the resulting change of his fax number, that he had notified the county and district clerks of the change of his fax number, that he had attempted to provide the same notice to all opposing counsel having pending cases against his

clients, and that he must have inadvertently not provided that notice to Krum.

After a hearing, the trial court granted Rice's motion to withdraw the deemed admissions and denied Krum's plea to the jurisdiction. Krum then filed this interlocutory appeal.

## Standard of Review in Pleas to the Jurisdiction

"Whether a court has subject matter jurisdiction is a question of law," and "[w]hether a pleader has alleged facts that affirmatively demonstrate a trial court's subject matter jurisdiction is a question of law reviewed de novo."[12] "When a plea to the jurisdiction challenges the pleadings, we determine if the pleader has alleged facts that affirmatively demonstrate the court's jurisdiction to hear the cause."[13] "If the pleadings do not contain sufficient facts to affirmatively demonstrate the trial court's jurisdiction but do not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading sufficiency and the plaintiffs should be afforded the opportunity to amend."[14] If the plea to the jurisdiction challenges the existence of jurisdictional facts, a court must also consider relevant evidence necessary to resolve the jurisdictional issues raised.[15]

## Discussion

### 1. The trial court's jurisdiction over Rice's challenge to the SORRO

11. See Tex. R. Civ. P. 198.2(a).

12. Tex. Dep't of Parks & Wildlife v. Miranda, 133 S.W.3d 217, 226 (Tex. 2004).

13. Id.

14. Id. at 226–27.

15. Id. at 227; see also City of Elsa v. Gonzalez, 325 S.W.3d 622, 625 (Tex. 2010) ("[W]e consider the plaintiff's pleadings and factual assertions, as well as any evidence in the record that is relevant to the jurisdictional issue.").

In Krum's first issue, it argues that its SORRO is a penal ordinance,[16] and therefore the trial court did not have jurisdiction of Rice's suit because he did not allege the violation of a property right. Krum did not raise this argument in the trial court. Alternatively, Krum argues that Rice's unclean hands bar his request for equitable relief.

■ Because of Texas's bifurcated court system, the validity of a criminal law "ordinarily should be determined by courts exercising criminal jurisdiction to avoid conflicting decisions between civil and criminal courts of last resort regarding the statute's meaning and validity."[17] A civil court thus generally does not have jurisdiction to hear a challenge to a criminal law's validity.[18] There is, however, an exception to that rule. When the plaintiff seeks equita-

ble relief based on the unconstitutionality of a criminal law, and the law is being enforced and actual or imminent prosecution is threatened, a civil court has jurisdiction to enjoin enforcement of the statute when there is a threat of irreparable injury to the plaintiff's property rights.[19]

■ Criminal laws proscribe certain conduct and punish individuals who commit that conduct.[20] Because Krum's SORRO proscribes certain conduct and sets out a punishment for its violation, the purpose of which is to redress a wrong to the public rather than to correct a wrong to an individual, it appears at first to be a criminal law.[21] However, the question of whether the residency restrictions in the SORRO are criminal cannot be determined by the simple test of "whether the wrong sought

**16.** *See* 82 C.J.S. Statutes § 529 (observing that "[s]trictly speaking, penal statutes are those imposing punishment for an offense committed against the State" but that the term "penal statutes" "has been enlarged to include all statutes which define an offense and prescribe a punishment").

**17.** *Briar Voluntary Fire Dep't v. Anderson*, No. 02–04–00258–CV, 2005 WL 1475409, at *2 (Tex. App.–Fort Worth June 23, 2005, no pet.) (mem. op.) (citing *State v. Morales*, 869 S.W.2d 941, 942, 947–48 (Tex. 1994)); *see also State v. Logue*, 376 S.W.2d 567, 569 (Tex. 1964) ("Because of the dual system of courts in this State—civil and criminal—this court will not pass on constitutionality of a criminal statute unless the requirement of irreparable injury of property rights is involved.").

**18.** *Morales*, 869 S.W.2d at 945; *Malone v. City of Houston*, 278 S.W.2d 204, 205 (Tex. Civ. App.–Galveston 1955, writ ref'd n.r.e.) (explaining that "[t]he equity jurisdiction inherent in the civil courts of general jurisdiction" in Texas is "properly invoked and exercised only in those cases wherein the enforcement of the statute or ordinance complained of will result in injury to a vested property right for which no adequate remedy is available through the criminal courts").

**19.** *Morales*, 869 S.W.2d at 945; *see also Dobbins v. City of Los Angeles*, 195 U.S. 223, 241, 25 S.Ct. 18, 22, 49 L.Ed. 169 (1904) (stating that "[i]t is well settled that, where property rights will be destroyed, unlawful interference by criminal proceedings under a void law or ordinance may be reached and controlled by a decree of a court of equity").

**20.** *See* Tex. Penal Code Ann. § 1.02 (West 2011) (stating that the purposes of the penal code include establishing a system of prohibitions, penalties, and correctional measures and that the provisions of the code are intended to give fair warning of what is prohibited and of the consequences of violation and to insure public safety through the deterrent influence of the penalties provided).

**21.** *See Huntington v. Attrill*, 146 U.S. 657, 668, 13 S.Ct. 224, 228, 36 L.Ed. 1123 (1892) (stating that "[t]he test whether a law is penal, in the strict and primary sense, is whether the wrong sought to be redressed is a wrong to the public or a wrong to the individual"); *see also Enviropower, L.L.C. v. Bear, Stearns & Co., Inc.*, 265 S.W.3d 16, 21 (Tex. App.–Houston [1st Dist.] 2008, no pet.) (same).

to be redressed is a wrong to the public or a wrong to the individual."[22] Higher courts construing similar laws intended to protect the public from sex offenders have held that the laws in those cases are civil. We must therefore look at the SORRO in light of those cases.

■■■ "Whether a statutory scheme is civil or criminal is first of all a question of statutory construction."[23] We first determine "whether the legislature meant the statute to establish 'civil' proceedings," and "[i]f so, we ordinarily defer to the legislature's stated intent."[24] "[W]e will reject the legislature's manifest intent only where a party challenging the statute provides 'the clearest proof' that 'the statutory scheme (is) so punitive either in purpose or effect as to negate (the State's) intention' to deem it 'civil.' "[25]

In *Kansas v. Hendricks*, the United States Supreme Court considered a Kansas law providing for civil commitment of those likely to engage in acts of sexual violence.[26] Hendricks sued after Kansas sought to have him committed under that law upon his release from prison.[27] Raising double jeopardy and ex post facto claims, Hendricks argued that Kansas's law established criminal proceedings, and, therefore, confinement under the law constituted punishment.

The Court noted that Kansas had described the act as establishing a civil commitment scheme. To overcome "the legislature's manifest intent," Hendricks had the "heavy burden" to establish that the law denominated as civil was in fact criminal.[28]

The Court noted that the law's "purpose is not retributive because it does not affix culpability for prior criminal conduct"; the law "does not make a criminal conviction a prerequisite for commitment—persons absolved of criminal responsibility may nonetheless be subject to confinement under the Act"; "unlike a criminal statute, no finding of scienter is required"; the legislature did not intend the law to function as a deterrent because it applies to persons "unlikely to be deterred by the threat of confinement"; and "the conditions surrounding that confinement do not suggest a punitive purpose on the State's part."[29]

Further, the Court said, the State has "a legitimate nonpunitive governmental objective" in taking measures "to restrict the freedom of the dangerously mentally ill."[30] The Court concluded that the law did not establish criminal proceedings and that commitment under the law was not punitive.[31] And because the Court had held that the law was civil in nature and that confinement under the law was not punishment, the Court further held that Kansas's initiation of the law's commitment proceedings against Hendricks did not constitute a second prosecution for double jeopardy

22. *See Huntington*, 146 U.S. at 668, 13 S.Ct. at 228.

23. *Smith v. Doe*, 538 U.S. 84, 92, 123 S.Ct. 1140, 1147, 155 L.Ed.2d 164 (2003) (quotation marks and citation omitted); *see also In re Commitment of Fisher*, 164 S.W.3d 637, 647 (Tex. 2005).

24. *Kansas v. Hendricks*, 521 U.S. 346, 361, 117 S.Ct. 2072, 2081–82, 138 L.Ed.2d 501 (1997).

25. *Id.* (citation omitted).

26. *Id.* at 350, 117 S.Ct. at 2076.

27. *Id.*

28. *Id.* at 361, 117 S.Ct. at 2082.

29. *Id.*, at 362–63, 117 S.Ct. at 2082.

30. *Id.* at 363, 117 S.Ct. at 2083.

31. *Id.* at 369, 117 S.Ct. at 2085.

purposes and did not raise ex post facto concerns.[32]

In *Smith v. Doe*, the United States Supreme Court looked at Alaska's Sex Offender Registration Act, which required any sex offender present in the state to register with a law enforcement agency, and which made information about registered sex offenders available to the public.[33] The issue in the case was whether the registration requirement was a retroactive punishment.[34]

As in *Hendricks*, the Court looked at the objective of the law as expressed in the Act's text.[35] The Act stated that its "primary government interest" was "protecting the public from sex offenders."[36] The respondents in the case pointed out that Alaska's constitution lists the need to protect the public as one of the purposes of criminal administration.[37] The Court rejected the argument that the Act was therefore criminal, relying on its own precedent and stating that "even if the objective of the Act is consistent with the purposes of the Alaska criminal justice system, the State's pursuit of it in a regulatory scheme does not make the objective punitive."[38] The Court concluded that the intent of the legislature was to create a civil, nonpunitive regime.[39]

The Court then looked at the effects of the Act by considering, similarly to *Hendricks*,

whether, in its necessary operation, the regulatory scheme: has been regarded in our history and traditions as a punishment; imposes an affirmative disability or restraint; promotes the traditional aims of punishment; has a rational connection to a nonpunitive purpose; or is excessive with respect to this purpose.[40]

After analyzing these factors, the Court concluded that the respondents had failed to show that the effects of the law negated Alaska's intention to establish a civil regulatory scheme.[41]

The Supreme Court of Texas, citing *Hendricks*, similarly concluded that Texas's civil commitment scheme for sexual offenders was a civil proceeding.[42] The petitioner in that case had argued that the Act was punitive because he did not have the mental ability to understand the commitment order and that his due process rights were violated because he was forced to proceed to trial when he was incompetent.[43] The court pointed out that the law referred to a "civil commitment procedure" and that the legislative findings stated that public safety and treatment were the primary statutory goals.[44] The court then considered the same factors used in *Hendricks* and *Smith* and concluded that the petitioner had failed to provide the clearest proof that the statute's effects were punitive.[45] The court held that the relevant

32. *Id.* at 370–71, 117 S.Ct. at 2086.

33. 538 U.S. 84, 89–91, 123 S.Ct. 1140, 1145–46, 155 L.Ed.2d 164 (2003).

34. *Id.* at 89, 123 S.Ct. at 1145.

35. *Id.* at 93, 123 S.Ct. at 1147.

36. *Id.*

37. *Id.* at 93, 123 S.Ct. at 1147.

38. *Id.* at 94, 123 S.Ct. at 1148.

39. *Id.* at 96, 123 S.Ct. at 1149.

40. *Id.*

41. *Id.* at 105, 123 S.Ct. at 1154.

42. *Fisher*, 164 S.W.3d at 653.

43. *Id.* at 644.

44. *Id.* at 647.

45. *Id.* at 647, 653 (referring to these factors as the *Kennedy* factors because they were set out by the United States Supreme Court in *Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 168–169, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963)).

factors "point to a conclusion that a commitment proceeding under the Act is a civil matter."[46]

In *Rodriguez v. State*, the Court of Criminal Appeals held that the intent of amendments to Texas's sex offender registration law were civil and remedial.[47] And, considering the same factors as *Hendricks* and *Smith*, the effect of the amendments was "not so punitive as to transform the statute into a criminal sanction."[48]

Admittedly, these cases primarily addressed whether laws relating to sex offenders constitute additional punishment for a *prior* sexual offense.[49] The U.S. Supreme Court in *Smith* acknowledged that, though the registration requirements at issue did not constitute additional punishment for the plaintiff's prior offense, they may give rise to a prosecution upon their violation.[50] This suggests that while such restrictions are not additional punishment for a *previous* crime, because the failure to abide by the restrictions made lead to a conviction for that failure, for the limited

purpose of determining what court has jurisdiction to decide their validity, they may qualify as "criminal laws."[51]

Nevertheless, the analysis used in these cases applies when a court must decide whether a law creates civil or criminal proceedings.[52] And applying that analysis, we conclude that Krum's city council intended to create a civil ordinance, not a criminal one.

The SORRO's preamble states that Krum "has a compelling interest in protecting the health, safety and welfare of the most vulnerable of its population" and that "prohibiting individuals required to register on the Texas Department of Public Safety's Sex Offender Database from entering areas where children regularly congregate and establishing a policy to restrict the property available for residence of sex offenders will provide better protection for children in the city." In accordance with these propositions, the ordinance then goes on to set out residency restrictions for individuals required to reg-

46. *Id.*

47. 93 S.W.3d 60, 79 (Tex. Crim. App. 2002).

48. *Id.*; *see also Jessep v. Potter Cty. Cmty. Supervision*, No. 07–13–00266–CV, 2015 WL 3877677, at *3 (Tex. App.–Amarillo June 23, 2015, no pet.) (mem. op.) (acknowledging that chapter 62 of the penal code, which sets out Texas's sex offender registration program, is civil and remedial in nature).

49. *See Hendricks*, 521 U.S. at 362–63, 117 S.Ct. at 2082 (considering whether the commitment law "affix[ed] culpability for prior criminal conduct" and whether it made "a criminal conviction a prerequisite for commitment"); *Smith*, 538 U.S. at 89, 123 S.Ct. at 1145; *Rodriguez*, 93 S.W.3d at 65 (considering whether application of Texas's sex offender registration statute violated the ex post facto clauses of the federal and Texas constitutions); *see also Fisher*, 164 S.W.3d at 644 (considering whether certain due process protections applicable to criminal proceedings

applied to a commitment proceeding under Texas's sexually violent predator statute).

50. *Smith*, 538 U.S. at 101–02, 123 S.Ct. at 1152.

51. *See* Tex. Penal Code Ann. § 1.02 (stating that the code's purposes include setting out a system of prohibitions and penalties). *Cf. Jessep*, 2015 WL 3877677, at *3, *4 (holding that code of criminal procedure chapter 62's registration scheme is civil in nature but that the only court that had jurisdiction over the plaintiff's declaratory judgment action challenging the risk level assigned to him under that chapter was the court that had sentenced him).

52. *See Hendricks*, 521 U.S. at 361, 117 S.Ct. at 2081–82 (considering not only whether confinement under Kansas's civil commitment law constituted a punishment for a prior conviction, but also whether commitment proceedings themselves were criminal proceedings).

ister on the State's sex offender database because of a violation involving a complainant under sixteen years of age. After setting out the restrictions, the ordinance provides an enforcement mechanism by making a person's violation of the restrictions a misdemeanor.

From its language, the intent of the ordinance is to use Krum's regulatory power to protect children in the city, rather than to establish criminal proceedings.[53] That is, the intent in enacting the SORRO was to create a remedial ordinance, not a punitive one. The restrictions have a rational connection to a nonpunitive purpose.[54] Krum has not shown that the SORRO establishes criminal proceedings. Thus, under the precedent cited above, the sections of the SORRO setting out the residency restrictions are civil, not criminal, though their violation may give rise to prosecution.[55]

Because the SORRO's residency restrictions are civil, not criminal, Rice did not have to plead a violation of a property right in order for the court to have jurisdiction over his claims. We overrule this part of Krum's first issue.

Krum further argues that Rice has unclean hands and that this bars his request for equitable relief. "The clean hands doctrine requires that one who seeks equity, does equity."[56] The doctrine "allows a court to refuse to grant equitable relief, such as an injunction, sought by one whose conduct in connection with the same matter ... has been unconscientious, unjust, or marked by a want of good faith, or one who has violated the principles of equity and righteous dealing."[57] "The clean hands doctrine should not be applied unless the party asserting the doctrine has been seriously harmed and the wrong complained of cannot be corrected without the application of the doctrine."[58] "The determination of whether a party has come to court with unclean hands is left to the discretion of the trial court."[59]

Krum's argument is based in part on Rice's community supervision terms,

**53.** *See Smith*, 538 U.S. at 93–94, 123 S.Ct. at 1147 (holding that Alaska's registration law was a civil scheme and, in reaching that conclusion, considering that "where a legislative restriction is an incident of the State's power to protect the health and safety of its citizens, it will be considered as evidencing an intent to exercise that regulatory power, and not a purpose to add to the punishment" (quotation marks and citations omitted)).

**54.** *See Fisher*, 164 S.W.3d at 651 (stating that the goals of Texas's Civil Commitment of Sexually Violent Predators Act were public safety and treatment, not punishment, and that the "rational connection to a nonpunitive purpose is a 'most significant' factor in determining whether the statute's effects are punitive or civil") (citation omitted).

**55.** *See* Tex. Code Crim. Proc. Ann. art. 62.102 (West Supp. 2016) (providing that a person commits an offense if the person is required to register as a sex offender and fails to do so); *Jessep*, 2015 WL 3877677, at *3, *4 (holding that chapter 62's registration scheme

is civil in nature); *see also Smith*, 538 U.S. at 101–02, 123 S.Ct. at 1152 (holding that Alaska's sex offender registration law was civil, not criminal, even though an individual may be prosecuted for its violation).

**56.** *Dunnagan v. Watson*, 204 S.W.3d 30, 41 (Tex. App.–Fort Worth 2006, pet. denied).

**57.** *Stewart Beach Condo. Homeowners Ass'n, Inc. v. Gili N Prop Invs., LLC*, 481 S.W.3d 336, 351 (Tex. App.–Houston [1st Dist.] 2015, no pet.) (quotation marks and citation omitted).

**58.** *Dunnagan*, 204 S.W.3d at 41 (citing *City of Fredericksburg v. Bopp*, 126 S.W.3d 218, 221 (Tex. App.–San Antonio 2003, no pet.)).

**59.** *Id.*; *see also Paciwest, Inc. v. Warner Alan Props., LLC*, 266 S.W.3d 559, 571 (Tex. App.–Fort Worth 2008, pet. denied) (stating that party asserting doctrine has burden of showing it was injured by the other party's conduct).

which prohibit him from going to or within a premises that is within 1,000 feet of where children commonly gather. Krum argues that Rice's living at a residence expressly forbidden under the terms of his community supervision should be considered a violation of the public policy of the state. Krum further argues that Rice's live pleading includes facts that confess a violation of his sex offender registration requirements. It contends that the pleading shows that he did not register with Krum's police department within seven days of his arrival in Krum following his becoming subject to sex offender registration requirements.

■ The public policy of the state, as established by the legislature, is that, in order to protect the public, *courts* should establish child safety zones when granting community supervision to defendants charged with certain crimes, and that safety zone should generally restrict such defendants from going within 1,000 feet of a place where children commonly gather.[60] And under the law, the judge in Rice's criminal case may modify the child safety zone applicable to him if it creates an undue hardship for him or is broader than is necessary to protect the public. Further, a community supervision and corrections department officer supervising such a defendant may permit the defendant to enter into the child safety zone on an event-by-event basis in certain situations, and the 1,000 feet restriction does not apply to a defendant's going to or from a private residence at which the defendant is required to reside as a condition of community supervision.[61]

Krum's SORRO goes farther than what that the legislature has concluded is necessary for the protection of the public. The state's policy aims to protect the public but to not impose restrictions that are greater than necessary to achieve that goal or that impose an undue hardship. Krum's ordinance has no such balancing. It is the legislature, not Krum's city council, which sets the public policy of this state.

Rice stated in his pleadings that he wished to live either with his parents or at another location in Krum that would also violate the SORRO. Regardless of whether Krum had the authority to enact the SORRO, Krum did not show that if Rice were to live at a residence that is more than 1,000 feet but less than 2,000 feet from a place where children commonly gather, his doing so would violate the public policy of this state.

As to Krum's claim that Rice failed to register his residence with the Krum police department, his pleading does not affirmatively demonstrate that statement. His pleading states that he has lived at his parents' house since his birth. It says nothing about either his registering or failing to register as required by law. Further, even assuming that Rice's failure to register was "in connection with the same matter" as the dispute over SORRO's ordinance, Krum failed to show that it was seriously harmed by Rice's failure to regis-

---

60. *See* Tex. Code Crim. Proc. Ann. art. 42.12, §§ 1 (stating that "[i]t is the purpose of this article to place wholly within the state courts the responsibility for determining . . . the conditions of community supervision, and the supervision of defendants placed on community supervision"), 13B(a)(1)(B) (requiring a judge granting community supervision to defendants described in the article to establish a child safety zone requiring the defendant to

not go within 1,000 feet of a premises where children commonly gather) (West Supp. 2016); *Town of Flower Mound v. Stafford Estates Ltd. P'ship*, 135 S.W.3d 620, 628 (Tex. 2004) (observing that the public policy of the state is reflected in its statutes).

61. *See* Tex. Code Crim. Proc. Ann. art. 42.12, § 13B(f), (i).

ter. The trial court did not abuse its discretion by declining to apply the clean hands doctrine. We overrule Krum's first issue.

### 2. Rice's standing to challenge the SORRO

■ In its second issue, Krum argues that Rice lacks standing to challenge the SORRO. Specifically, Krum argues that, after entering a guilty plea, Rice accepted terms of deferred adjudication community supervision that prohibited him from even *going* within (much less residing within) 1,000 feet of a park and therefore also prohibited him from living with his parents. Krum contends that because Rice had "already voluntarily subjected himself to a distance restriction prior to re-entering the City," any injury Rice has from not being able to live at his parents' house is due to those restrictions and is not a result of any action by Krum.[62] Thus, it argues, none of Rice's alleged injuries are fairly traceable to Krum, as he had voluntarily forfeited any ability to lawfully reside at his parents' house, the only property Rice specifically identified in his pleading as a place that the SORRO prevented him from living. Krum did not assert this particular argument in the trial court; its standing argument there was based on Rice's deemed admission that he had no standing.

Rice argues that, in contrast to the SORRO, Rice's conditions of probation are subject to modification, and thus the distance restriction could be removed from those conditions at any time. Further, he argues, for a period of time after he is either convicted and released or is discharged from community supervision, he will have to register as a sex offender (and thus be affected by the SORRO) but will not be subject to a probation condition restricting where he may go or reside. At the time he filed suit, Rice still had a distance restriction as a probation condition. Rice cannot have standing based on the allegation that, at some as yet unknown point in the future, only the SORRO would prevent him from living near a place where children gather.[63]

However, Rice alleged in his petition a desire to live at another location within Krum, one which would be prohibited by the SORRO but would *not* be prohibited by the terms of his probation. Though Rice did not give a specific address of a place in Krum other than his parents' house where he would like to live, he did allege that he wished to "establish his residence at another location within the City of Krum [that is] prohibited by Defendant's SORRO."

The SORRO is broader than Rice's community supervision restrictions, and thus actions that are not barred by the terms of his community supervision are prohibited under the SORRO. Rice alleged that Krum has enforced its SORRO against him, preventing him from establishing a residence in the city, and Rice has thus alleged an injury particular to himself.[64] Rice has standing to challenge the SORRO.

---

62. *See Hall v. Douglas*, 380 S.W.3d 860, 872–73 (Tex. App.–Dallas 2012, no pet.) (stating that "[a] person has standing to sue when he is personally aggrieved by the alleged wrong"); *Eden Cooper, LP v. City of Arlington*, No. 02–11–00439–CV, 2012 WL 2428481, at *4 (Tex. App.–Fort Worth June 28, 2012, no pet.) (mem. op.) (stating that standing had three minimum requirements: the plaintiff must have suffered a concrete, particularized injury; the injury must be fairly traceable to the defendant; and it must be likely that the injury will be redress by a favorable decision).

63. *See Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993) ("Standing is determined at the time suit is filed in the trial court.").

64. *See Hall*, 380 S.W.3d at 872–73.

Krum asserts in its reply brief that Rice did not have standing because when he filed this suit, he was not a resident of Krum and therefore was not subject to enforcement of the SORRO. Rice alleged that he still wished to live in Krum but was unable to do so without fear of criminal prosecution. This was not a speculative fear; Rice further alleged that he had moved specifically because Krum police officers had twice come to his home, ordered him to move, and threatened enforcement of the SORRO.[65] We overrule this issue.

### 3. Rice's failure to comply with notice requirements

 In Krum's third issue, it asserts that Rice failed to comply with notice requirements necessary to establish the trial court's jurisdiction.

Krum has a pre-suit notification ordinance stating in part that no suit may be instituted against it "unless the plaintiff therein shall ever prove that[,] previous to the filing of the original petition[,] the plaintiff applied to the City Council for redress, satisfaction, compensation, or relief, as the cause may be, and that the same was refused by vote of the City Council." Krum asserts that Rice failed to comply with this part of the ordinance. Krum further argues that there is no evidence in the record that Rice complied with the part of that ordinance that requires notice to be served on the city secretary.

Section 101.101 of the Civil Practice and Remedies Code requires notice to be given to a governmental unit of a claim brought against it under that chapter, and that section also authorizes notice requirements contained in city charters and ordinances such as Krum's.[66] The purpose of requiring pre-suit notice of claims against governmental units "is to ensure prompt reporting of claims in order to enable governmental units to gather information necessary to guard against unfounded claims, settle claims, and prepare for trial."[67]

Rice argues that Krum had actual notice of his claims by way of the letter his attorney had sent to Krum's attorney before filing suit. At the hearing, the trial court repeatedly asked Krum's attorney what actual notice looked like under Krum's ordinance and why the letter did not constitute actual notice. Krum's attorney stated that he had no case addressing that question. Throughout that part of the hearing, the attorney continued to assert that Rice had to strictly comply with the notice procedures in the ordinance and declined to address what would constitute actual notice to Krum.

Rice also contends that "it is not altogether clear that" Krum's ordinance applies to claims for equitable relief. To that end, Rice directs our attention to a 1918 case out of our sister court in El Paso.

In the El Paso case, the court of appeals considered a notice provision nearly identical to the one appearing in Krum's ordinance.[68] The El Paso court determined that the provision "was manifestly intended to protect the city against the institu-

---

65. *See id.*

66. Tex. Civ. Prac. & Rem. Code Ann. § 101.101; *but see Bd. of Trs. of Galveston Wharves v. O'Rourke*, 405 S.W.3d 228, 233 n.1 (Tex. App.–Houston [1st Dist.] 2013) (holding that section 101.101 did not apply to the appellee's claims for declaratory and injunctive relief based on allegations of invasion of privacy and civil conspiracy).

67. *Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex. 1995).

68. *El Paso Union Passenger Depot Co. v. Look*, 201 S.W. 714, 716 (Tex. Civ. App.–El Paso 1918) (considering charter language that no suit may be maintained against El Paso "unless the plaintiff therein shall aver and prove that previous to the filing of his original petition he applied to the city council for redress,

tion of suits upon pecuniary demands until it had been afforded an opportunity to investigate and amicably adjust the same" and to "protect the city against needless suits affecting its management and control of its own property."[69] The court held that the suit in that case did not fall within either of those categories, and "[a]n examination of the authorities disclose[d] that it is very generally held that such provisions are construed as not applying to actions purely equitable in their nature."[70] Rice argues that this court should follow El Paso and hold that Krum's pre-suit notification ordinance does not apply to his purely equitable claims.[71]

 "Notice statutes, being in derogation of the common law, are to be strictly construed."[72] Texas courts have long held that certain claims may be asserted against a municipality without first complying with that municipality's pre-suit notice requirements.[73] In particular, Texas courts have held that a municipal notice ordinance does not apply to prevent suit when the plaintiff's claim is one provided for under the Texas or federal Constitution,[74] when the plaintiff's claim is based on a violation of the Texas or federal Constitution,[75] and when the application of the ordinance to the plaintiff's claim violates the open courts provision of the Texas constitution.[76]

In this case, Rice's claims for declaratory and injunctive relief are based on the

---

satisfaction, compensation or relief, as the case may be, and that the same was by the city council refused"), *aff'd*, 228 S.W. 917 (Tex. Comm'n App. 1921).

69. *Id.* at 717.

70. *Id.*

71. *See Armentrout v. Tex. Dep't of Water Res.*, 675 S.W.2d 243, 245 (Tex. App.–Austin 1984, no writ) (stating that an action for declaratory judgment is neither legal nor equitable, but legal and equitable principles can apply to it, and concluding that the declaratory judgment sought in the case was sufficiently akin to an equitable remedy such as to make the public's interest a valid consideration).

72. *City of Waco v. Roberts*, 121 Tex. 217, 48 S.W.2d 577, 580 (1932), *disapproved of on other grounds by City of Houston v. Renault, Inc.*, 431 S.W.2d 322 (Tex. 1968).

73. *See, e.g., City of Houston v. Kleinecke*, 26 S.W. 250, 250 (Tex. Civ. App. 1894, no writ) (stating that the notice provision in the city's charter did not apply to claim that city had taken appellee's property by digging a ditch and destroying the street in front of the appellee's property); *see also Mayhew v. Town of Sunnyvale*, 774 S.W.2d 284, 297 (Tex. App.–Dallas 1989, writ denied) (holding that town's charter provision requiring the giving of a notice of claim of injury was not applicable to

the plaintiff's federal and state constitutional claims).

74. *City of Waco*, 48 S.W.2d at 579 (holding that when the appellees' property was taken in violation of the Texas Constitution, "their cause of action arose under the Constitution itself, and the [city's] charter was ineffective to make the additional requirement" of notice before the appellees sued); *City of El Paso v. Nicholson*, 361 S.W.2d 415, 417 (Tex. Civ. App.–El Paso 1962, writ ref'd n.r.e.) (holding alternatively that El Paso's notice provision did not apply to the appellee's claim because the suit was not a damage suit, the appellee sought only what the city had taken from him, and, as money had been illegally taken from the appellee in contravention of article 1, section 19 of Texas Constitution, the appellee need not comply with the notice provision).

75. *See Mayhew*, 774 S.W.2d at 297; *cf. O'Rourke*, 405 S.W.3d at 233 n.1.

76. *See Hanks v. City of Port Arthur*, 121 Tex. 202, 48 S.W.2d 944, 950 (1932) (holding that the city's notice provision in its charter was void for violating article 1, section 13 of the Texas Constitution); *Borne v. City of Garland*, 718 S.W.2d 22, 24–25 (Tex. App.–Dallas 1986, writ ref'd n.r.e.) (holding that Garland's thirty-day notice provision with no exception for good cause or actual notice violated the open courts provision).

alleged unconstitutionality of Krum's SOR-RO.[77] He seeks not compensatory damages, but equitable relief from the enforcement of the SORRO. We agree with Rice that the claims he asserted are not the kinds of claims for which notice is required.[78]

Further, Krum had actual notice of his claims. Rice's attorney sent a letter to Krum's attorney to notify that attorney "of a claim that [Rice] has and intends to pursue against the City." Krum's only argument under this issue relates to whether specific notice requirements were met, but it makes no argument on appeal for why this letter did not constitute actual notice.

While the letter from Rice's attorney demanded that Krum repeal its ordinance or face a lawsuit, nothing in the record shows that Krum's city council voted on and declined to repeal the ordinance or that Rice served notice of his intent to sue on Krum's secretary, and thus it did not comply with the notice ordinance. However, the letter that was provided to Krum's city attorney contained Rice's attorney's opinion that Krum's city council had no legal authority to enact the SORRO. The letter informed the attorney that, due to the SORRO and Krum police officers' enforcement of it, Rice had been forced to vacate his residence, and it made it clear that Rice intended to sue Krum unless its city council repealed the SORRO. Rice's attorney sent the letter to Krum's attorney after speaking to the attorney and confirming that he was employed as acting

city attorney for Krum. Krum makes no argument for why the letter did not provide Krum with actual notice, and we hold that Krum had actual notice of Rice's claims. We overrule Krum's third issue.

### 4. Krum's authority to enact the SORRO

Krum argues in its fourth issue that it had sufficient statutory authority to enact the SORRO. Krum argues that Rice's pleadings are "fatally defective for failure to state a valid legal theory under which any relief could be granted," and "[a]s redressability of a plaintiff's claim is a component to standing," the trial court erred by denying its plea to the jurisdiction. Rice pled that Krum is a general law city, that general law cities do not have legal authority to enact SORROs, and that consequently, Krum's SORRO is legally void. All of Krum's arguments under this issue go strictly to the merits of Rice's claims, and we cannot determine the validity of Krum's arguments without reaching the ultimate legal questions at issue in the suit. Accordingly, the trial court did not err by denying this ground in Krum's plea to the jurisdiction,[79] and we overrule Krum's fourth issue.

### 5. The withdrawal of the deemed admissions

Finally, Krum argues in its fifth issue that the trial court erred by allowing the withdrawal of the deemed admissions.

77. See Mayhew, 774 S.W.2d at 297; Adams v. City of Weslaco, No. 13–06–00697–CV, 2009 WL 1089442, at *15 (Tex. App.–Corpus Christi Apr. 23, 2009, no pet.) (mem. op.) (determining city's ordinance caused a regulatory taking of business's property rights in its contracts with existing customers).

78. See Mayhew, 774 S.W.2d at 297.

79. See Weiderman v. City of Arlington, 480 S.W.3d 32, 36 (Tex. App.–Fort Worth 2015,

pet. denied) (noting that "[a] plea to the jurisdiction is a dilatory plea that is unconcerned with the merits of the asserted claims"); see also Bland I.S.D. v. Blue, 34 S.W.3d 547, 554 (Tex. 2000) ("The purpose of a dilatory plea is not to force the plaintiffs to preview their case on the merits but to establish a reason why the merits of the plaintiffs' claims should never be reached.").

Krum raises this argument in this interlocutory appeal because it had relied on these deemed admissions for its plea to the jurisdiction grounds, and it believes the trial court's ruling "may have caused the trial court to inappropriately exclude facts not subject to genuine dispute from its consideration while evaluating the arguments raised at the plea hearing."

 "Generally, a party responding to requests for admissions must serve a written response on the requesting party within [thirty] days after service."[80] "If the response is not served timely, however, the request is deemed admitted without the necessity of a court order."[81] "[A] trial court may allow the withdrawal of a deemed admission upon a showing of (1) good cause and (2) no undue prejudice."[82]

 Good cause "is established by showing [that] the failure involved was an accident or mistake, not intentional or the result of conscious indifference."[83] Undue prejudice depends "on whether withdrawing an admission . . . will delay trial or significantly hamper the opposing party's ability to prepare for it."[84] As the Supreme Court of Texas has said, "requests for admission should be used as 'a tool, not a trapdoor,'" and they should not be used to demand that a plaintiff admit that he or she had no cause of action.[85]

 Here, Rice's attorney explained why he had not responded to the deemed admissions. The fax number that Krum

had for him had been the fax number he shared with his wife, also an attorney. In June 2015, Rice's attorney moved his law offices. The move was completed in early July 2015. His wife, who was also moving her offices, kept the fax number the two had previously shared.

Rice's attorney notified the county and district clerks of Denton County of his new address and fax number, and he had attempted to provide the same notice to opposing counsel in all his cases. He inadvertently failed to notify counsel for Krum. Krum's counsel did not serve Rice's attorney by any means other than by fax, and therefore Rice's attorney never received the requests for admissions. He only learned of them when he read Krum's plea to the jurisdiction that was based in part on the deemed admissions. We hold that the trial court did not abuse its discretion by determining that this explanation showed that the attorney's failure to respond was an accident or mistake, and not intentional or the result of conscious indifference, and that it therefore constituted good cause.[86]

Krum counters that the trial court "acted unreasonably in permitting the deemed admissions to be withdrawn during [Krum's] only hearing to present evidence in support of its plea to the jurisdiction." It contends that it "was effectively denied any reasonable opportunity to secure other testimony to prove facts anticipated to be

---

80. *Marino v. King*, 355 S.W.3d 629, 633 (Tex. 2011) (citing Tex. R. Civ. P. 198.2(a)).

81. *Id.*

82. *Id.* (citing Tex. R. Civ. P. 198.3).

83. *Id.* (internal quotations and citation omitted).

84. *Id.* (internal quotations and citation omitted).

85. *Id.* at 632 (citation omitted).

86. *See id.* at 633, 634 (stating that trial courts have broad discretion to permit or deny the withdrawal of deemed admissions and holding that good cause existed in that case for the withdrawal of the deemed admissions "because there is no evidence of flagrant bad faith or callous disregard for the rules and nothing to justify a presumption that Marino's defense lacks merit").

established and indisputable by virtue of deemed admissions (or rebut matters thought to be excluded from consideration by [Rice]'s failure to respond)" and that this "contributed to substantial undue prejudice to [Krum] through denial of the full measure of the benefits of governmental immunity—i.e., an early disposal of baseless lawsuits without the waste of taxpayer money." We disagree.

 First, "'absent flagrant bad faith or callous disregard for the rules, due process bars merits-preclusive sanctions,'" which is what Krum hoped the deemed admissions would be in this case.[87] There was no evidence of flagrant bad faith or callous disregard for the rules by Rice or his attorney. Second, Rice's attorney filed the motion to withdraw the deemed admissions on September 9, 2015. The hearing on the motion to withdraw was held on September 23. Krum thus had two weeks' time between the filing of Rice's motion to have the admissions withdrawn and the hearing on the motion and on the plea to the jurisdiction, but the record does not indicate that it sought a delay of the hearing on its plea to the jurisdiction or that it asked the hearing on that motion to be held on some other day after the trial court's ruling on the motion to withdraw the admissions. Despite Rice's attorney stating at the hearing that Krum may be entitled to a continuance, Krum did not ask for one.

Further, when admissions are deemed against a plaintiff, they are deemed regardless of the merits of the plaintiff's claims, and a dismissal based on deemed admissions says nothing about whether the plaintiff's claims are baseless. If Rice's suit is baseless and should be dismissed as Krum claims, Krum has other avenues for

obtaining that dismissal beyond the merits-preclusive deemed admissions. There is nothing to suggest that "the presentation of the merits of the action will be subserved by permitting [Rice] to . . . withdraw the admission[s]."[88] Accordingly, the trial court did not abuse its discretion by permitting the withdrawal of the deemed admissions. We overrule Krum's fifth issue.

## Conclusion

Having overruled Krum's five issues, we affirm the trial court's order denying Krum's plea to the jurisdiction and plea in abatement, and we remand this case to the trial court for further proceedings.

KERRY FITZGERALD filed a dissenting opinion.

KERRY FITZGERALD, Justice, dissenting.

Appellee Taylor Rice attacks an ordinance that the parties agree is a criminal ordinance proscribing the parameters of where he wanted to live, that is, with his parents, when the same proscription was part of his probationary conditions. Even if Rice prevailed on his attack on the ordinance, he would still be precluded from living in his parents' house because of the restrictions in his probation received after pleading guilty to the criminal offense of sexual assault of a child. Because the issue of whether he can legally reside with his parents is moot, further review of this case is a fruitless endeavor and a total waste of judicial resources.

In context, Rice challenges the constitutionality of Appellant City of Krum, Texas's Sex Offender Registration Restrictive

---

87. *Id.* at 633 (quoting *Wheeler v. Green,* 157 S.W.3d 439, 443 (Tex. 2005)).

88. *See* Tex. R. Civ. P. 198.3(b).

Ordinance (SORRO). This ordinance[1] was passed by the City of Krum on January 23, 2012, and provides in part that it is "unlawful for a sex offender to establish a permanent residence or a temporary residence within 2000 feet of any premises where children commonly gather." Any person violating a provision of this section[2] shall be guilty of a misdemeanor, and upon conviction shall be subject to a fine not to exceed $500.

The record shows and the parties do not dispute that pursuant to a plea bargain, Rice pleaded guilty to sexual assault of a child, adjudication was deferred, and he was placed on ten years' probation on October 24, 2014. The terms of his probation contain the following restriction: "Do not go in, on, or within 1,000 feet of a premise[s] where children commonly gather." Rice was required to register as a sex offender.[3]

According to his petition,[4] the core of Rice's complaint arises from his lifelong residence with his parents, whose house is located only seventy-seven feet from a public park frequented by children. Rice alleged his fervent desire to return and live at his parents' house in Krum or establish his residence at another location in Krum prohibited by the SORRO; however, he cannot because of fear of criminal prosecution due to the SORRO's prohibition.

Thus, Rice's parents' house was within the area subject to prohibitions contained in both the city's ordinance (2,000 feet) and Rice's probationary conditions (1,000 feet).

Krum responded in its Amended Answer and Plea to the Jurisdiction that Rice lacked standing, had unclean hands, and Rice's claims were moot. In part, Krum stated in its Plea that:

> Even if this Ordinance was struck down as requested by Plaintiff, he still could not live in his home on 137 W. Sixth Street without constantly being in violation of his probation terms. In that his Plea Bargain and sentence in his Second Degree felony case was for Deferred Adjudication, any violation of the Terms and Conditions of his Community Supervision could result in a prison sentence of 2–20 years and a $10,000.00 fine.

Rice responded by repeating his allegations in his petition, that Rice had a fervent desire to return and live at his parents' house in Krum or establish his residence at another location in Krum prohibited by the SORRO, and, therefore, the issue was not moot.

---

1. Krum, Tex., Ordinance 2012–01–01 (Jan. 23, 2012) (amending chapter 8 of Krum's Code of Ordinances to add the SORRO, codified at Krum, Tex., Code of Ordinances ch. 8, art. 8.05 (2016)).

2. *Id.* § 8.05.003(b).

3. Rice acknowledges he was placed on probation as an "undisputed" fact.

4. Rice's petition alleges that "[t]he Plaintiff [Appellee] is 22 years old, and has resided since his birth with his parents at 137 W. 6th Street in the City of Krum." The parties agree that this residential address is located within seventy-seven feet of the Krum Municipal Park where children commonly gather. The petition alleges Rice was forced to vacate the residence in Krum because of the threat of criminal prosecution under the void ordinance. Rice desires to return to his parents' residence or establish a residence at another location within Krum prohibited by the SORRO, but he is unable to do so because of fear of criminal prosecution under the SORRO. According to his Petition, Rice did not live within Krum when the petition was filed. Based on these factual allegations, the petition alleges that Krum's ordinance is void and unconstitutional, in violation of article XI, section 4 of the Texas Constitution, and seeks to enjoin its enforcement.

On appeal, Krum continued to argue that regardless of the SORRO and its application, Rice could not live at his parents' house because of the restrictions in his probationary terms.

On appeal, Rice argued that the Original Petition alleged he wanted to return to his parents' house and "his continuing desire to 'establish his residence at another location within the City of Krum prohibited by Defendant's SORRO' *which is not prohibited by the condition of his community supervision.*" (emphasis added). However, Rice's position, emphasized by the italicized phrase, is woefully disingenuous because this phrase does not appear in the petition. Rice never referred to the conditions of his community supervision in his petition. The petition only alleged in vague terms a general desire to continue to search for a location elsewhere which would be somewhere within the SORRO's restrictions. Rice, therefore, misrepresented his position in his brief before this court and has misled the majority.

Rice also responded on appeal that his probationary conditions could be modified by the District Court and that eventually the SORRO restrictions would outlast the term of the probationary conditions. Rice's arguments, based on pure speculation and cast in uncertain terms, have no merit.

The record shows the issue of mootness was raised and argued in the trial court. The record also shows Rice never attempted to amend his petition to assert residency beyond the 1,000-foot limit but within the 2,000-foot limit in order to avoid the prohibitions of his probationary conditions.

Krum's mootness argument stands independently on its own merits. It does not turn on the resolution of the SORRO's validity or whether the SORRO is a criminal or civil law. Thus, Krum's argument remains viable regardless of the resolution of Rice's constitutional attack upon the SORRO. Krum clearly asserts that whatever the outcome of Rice's constitutional challenge to the SORRO, Rice is still bound by his probationary conditions and is prohibited from living within 1,000 feet of the park commonly frequented by children, an area including his parents' house.

Krum's argument that the case is moot should prevail in view of the terms and conditions of Rice's probation. This jurisdictional argument should be addressed.[5]

In *Heckman v. Williamson County*,[6] the court addressed mootness, stating in part that if a justiciable controversy does not exist between the parties, that is, if the issues presented are no longer "live," a court may not decide the case.

In *In re Estate of Hemsley*,[7] the court stated an appellate court may not decide a moot controversy, a prohibition rooted in the separation of powers doctrine in the Texas and United States Constitutions that prohibits courts from rendering advisory opinions. An issue becomes moot when one seeks a judgment on some matter which, when rendered for any reason, cannot have any practical legal effect on a then-existing controversy.

Thus, if a case is moot, the court must vacate any order or judgment previously issued and dismiss the case for want of jurisdiction.[8]

---

5. *Meeker v. Tarrant Cty. Coll. Dist.*, 317 S.W.3d 754, 758–59 (Tex. App.–Fort Worth 2010, pet. denied).

6. 369 S.W.3d 137, 162 (Tex. 2012).

7. 460 S.W.3d 629, 638 (Tex. App.–El Paso 2014, pet. denied); *see* also *City of Dallas v. Woodfield*, 305 S.W.3d 412, 416 (Tex. App.–Dallas 2010).

8. *Speer v. Presbyterian Children's Home & Serv. Agency*, 847 S.W.2d 227, 228 (Tex. 1993)

## CONCLUSION

The court should vacate the order denying the defendant's Plea to the Jurisdiction and dismiss the case for want of jurisdiction. I respectfully dissent.

(holding that if a case is moot, the appellate court is required to vacate any judgment or order in the trial court and dismiss the case); *Blackwood v. Bunton*, No. 02–12–325–CV, 2013 WL 5498186, at *1 (Tex. App.–Fort Worth Oct. 3, 2013, no pet.) (mem. op.).